Good morning. May it please the Court, I'm Frank Patrick and I represent the plaintiffs' appellants in this matter, and we're here to make argument as to why Qwest can no longer keep undisputed overcharges based on unlawful rates exacted from the plaintiffs under the 1996 Telecommunications Act. Based on some legality, legal technicality, they've been supposed to never have charged. The basic problem with this case is that the enforcement of the TCA is a complicated matter. It's now obvious, however, that a violation of the TCA by Qwest and to bring about a just and right result is what this Court's task is. I'm sorry? That's correct, Your Honor. I believe that's exactly what the issue that the district court dismissed it on. The reason why the district court raised the issue of the statute of limitations is because the district court apparently didn't consider the jurisdictional grant that the FCC had given to the State of Oregon's PUC to set rates. That jurisdictional grant delegated to, excuse me, not jurisdictional, but grant of the delegation to set rates went from May 1, 1996, April 4, February 4 is when the Act was enacted, and the PUC had already started a rate-setting case at that time. That rate-setting case went from May 1, 1996, until November 15 of 2007. During that period of time, no party could ever do anything to bring this case before the Fed, for its Federal claims in front of the Federal courts, because the filed rate doctrine prevents any court intervention in a case that's a rate-setting case. As a result of that, the district court apparently failed to recognize that the PUC had any right to set the rate, or had any right to assume the filed rate doctrine. Kagan Apple said that there was no filed rate problem, so how does this interact with that? Say it again, I'm sorry? That there wasn't a filed rate problem in that case. In Duval? Yes. Okay. The filed rate problem was not in Duval. The facts in Duval are different for one huge reason. There was no rate-setting process, in process, during the time that Duval had been set. I thought what the opinion said, assumed that there was or didn't care whether it was, and essentially said something to the effect of that because this was a case under the FCC's delegated authority and not an external case such as a tort case or something outside of the statutory scheme. There was no filed rate doctrine that was applicable. I think you're referring to the Ninth Circuit's jurisdictional issue that it found in the Coeur d'Alene case. No, I'm referring to the heading under Davel that says the filed rate doctrine. And it says that the FCC chose to require filing of tariffs for certain aspects of the payphone system with respect to the public access line rates. The FCC imposed a rate filing requirement, and the filed tariff doctrine does not borrow suit to enforce the command of the very regulatory statute giving rise to the tariff filing requirement, even where the effect of enforcement would be to change the filed tariff. So why isn't that applicable here? Why is the filed rate doctrine applicable here is because the FCC had delegated to the State PUC the rate-setting. And that's what I just – I thought that's what I just read in Davel. No? Well, I guess I'm not sure that I understand the question, but the doctrine Short question is why the filed rate discussion in Davel, which you said doesn't exist but does, it goes on for several pages, doesn't apply here. That's the question. Why does the filed rate doctrine apply here? Why does the discussion in Davel that says it doesn't apply, not apply here? It didn't apply in Davel because there was no rate-setting process. Is that what Davel says? Well, Davel says, I believe, is that there is no filed rate doctrine that's going to apply unless tariffs are required to be filed. And what Davel said was tariffs were refiled. Isn't that, I think, a little later on in the opinion, it says the filed rate doctrine doesn't apply unless, or it all but, in the case of but, it does apply. Accordingly, we hold that Davel's claims are not barred by the filed rate doctrine, but that's because there was not an issue of the filed rates being required there. Here, in this case, it's slightly different, because the difference is the filed rate doctrine does not stand as a bar to construing the reach of and then enforcing the waiver order's reimbursement requirement in a case such as this one. This is so, even though the lawsuit, in effect, challenges the tariffs on file between 1997 and 2002, and if successful, would result in Davel paying an amount for public access line services different from that provided in most tariffs. Isn't that exactly what we've got here? Where are you reading from? I'm sorry. Reading from the opinion. I'm not making it up. No, I understand. I'm looking at the opinion. Page 1086. 1086. I think the problem, Your Honor, is, is that you're assuming facts that are the same and they're not the same in this case. I'm assuming the facts that they were assuming, which they said, even though you're challenging the tariffs on file between 1997 and 2002, which is what you're doing here, and if successful, would result in Davel paying an amount for public access line services different from those provided in those tariffs. I'm sorry. I now understand the question. We're not challenging the rates. We were not challenging the rates. Davel was challenging the rates. You're not challenging the rates, and why are you looking for a refund? We're not challenging the rates because what happened in this case is the PUC had been given the task of setting the rates. That process of setting the rates continued from May 1 of 1996 through 2007. In Davel, there wasn't a rate-setting process, so nobody was challenging the rates. Based on the filed rate doctrine, however, once you have a rate-setting process in process, you can't challenge the rate until it's done, and that's why we say that the statute of limitations in this case never commenced to accrue. At no time could anybody have come to the Federal Court and said, we want to pursue our Federal claims, because the predicate to those Federal claims was the setting of the rate at the Oregon PUC. Well, are you claiming that your case was not ripe for making a claim? Absolutely. We made that claim to the district court. We said it's not justiciable. Now, Q. West filed new rates in 2003 after the Wisconsin order. Why didn't that put you on notice? Because those rates were filed in the process of the rate-setting process. In other words, there was still a rate-setting process going on. Those rates were interim. They were filed under what was called a price gap. They could have dropped them the next day, but more important, they filed them without prejudice to their challenges at the Oregon Court of Appeals and the FCC. What is your best case for the proposition that a weakness in a plaintiff's case tolls the statute of limitation? You say you had — you couldn't file because of a question of rightness or whatever. You hadn't exhausted some state remedy or question of exhaustion. Those are all defenses to a plaintiff's claim, but what's your best case that those defenses toll the statute of limitation? Well, I would argue that the claims were not justiciable. They couldn't be brought before a court because the predicate to that claim was, in fact, a final filed rate. There was no final filed rate until November 15th of 2007, and as such, all of the rates were interim, subject to refund. Okay. And in 2007, when did you file? When did you file your ‑‑ We filed within two years of the filed rate being filed. The rate was filed November 15th of 2007. We filed on November 9, 2009. It was a two-year statute of limitations. But the important part, as we come back to that, is that the issue with respect to justiciability is simply this. The predicate to any claim under the Federal claims had to be the setting of a final rate. When Quest dropped its rates in 2003, it did so without prejudice to the challenges it was making in the Court of Appeals. In fact, at that time in 2003, this plaintiff was pursuing the reversal of the rates which were unlawful and turned out to be unlawful at the Oregon Court of Appeals. As a part of the administrative process that the declaratory ruling that has just been filed, all of those rights have to be preserved, all of those remedies have to be exhausted, or they will lose their claims. Well, did the Oregon PUC have jurisdiction when it entered its order in 2011? When it entered its order in 2011. Did it have jurisdiction when it entered that order? Absolutely. In fact, the reason why ‑‑ Then why would not this ‑‑ The reason why your position was they don't have jurisdiction, because it was ‑‑ There's two issues on jurisdiction. In the Coeur d'Alene case, this Court determined that no State, tribe, or other venue has jurisdiction of a Federal matter under the TCA. In that case, the Coeur d'Alene case, they were asserting against AT&T that they had to provide this relief and remedy. And this Court said, no, you're not entitled to that because that has to go outside. It has to be brought within the FCC. You can't bring it here independently. This is not the place for that to be. You have no jurisdiction. And that's what ‑‑ And why did you just answer Judge Goodwin and say there was jurisdiction when your position in your dismissal papers was that there was no jurisdiction? Two separate proceedings. The first proceeding at the Oregon PUC was a rate-setting proceeding. That's the proceeding. But what they decided was that there was ‑‑ I thought that was the refund case in which they ultimately decided that there was no refund because the waiver order wasn't relied upon. That's the second case. That's the case that he's referring to. That's the case he's referring to. That's what he asked you. Okay. The jurisdictional issue is different in the two cases. By the way, this is exactly the confusion that we had at the district court. That's what he asked you. He said, what about the December 2011 order? 2011, the PUC did have jurisdiction. Yes. It had jurisdiction. Only the question of whether you get a refund because of the waiver. I thought you said they didn't. Only because in the process of the rate-setting case, the PUC staff and the parties all agreed that the refunds would be established in the refund case which had been filed in 2001. It's a jurisdictional issue with respect to anything prior to the filed rate ‑‑ the rate being filed. Where does the court have the authority to go forward if the case is not ‑‑ if it's not justiciable? That's the problem. It wasn't justiciable. And that's the reason why there was no jurisdiction to come to the district court. What was pending in 2011? What was decided in the 2011 PUC decision? I'm sorry? What was decided in the 2011 PUC decision? What was decided in the 2011 PUC decision is that Quest did not rely on the waiver order. What does it have to do with the rate decision? Where's the rate issue there? Well, we view that as being part of the refund. Why they did that, we believe they didn't have the jurisdiction to do that. In other words, they made a decision that they didn't have the jurisdiction to do. They didn't have the jurisdiction to interpret and apply the waiver order in a manner that they did. That was a matter that was reserved and should have been reserved for the FCC or the United States District Court. But the problem is, is that the PUC did have the authority and the jurisdiction to determine refunds under its rate setting delegation from the FCC. The PUC and the parties agreed that the rate setting would be finished and the rate setting would be accomplished in the refund case. The Duval Court basically made the decision that there was a tariff that had not been filed and that the party was on inquiry notice. But at the time that that tariff was to be filed, there was no rate setting proceeding in process. That's the distinction between Duval and our case here. The declaratory ruling which was just issued by the court, by the FCC, literally two days after the reply brief was filed, has changed the game dramatically. Because now we know that the only place that you can pursue the claims and the refunds has to be at the PUC. Now we know that the issue of ripeness or justiciability has to await until the state PUC proceedings were final with respect to the rate that it had to be set. Now we know from the declaratory ruling that determinations of refunds due under the TCA were first to be set in the context of the rate setting. I'm reserving the balance of time that I have for rebuttal. I'm sorry. Good morning, Your Honors. May it please the Court. Lawrence Reichman representing Defendant Apelli, Quest Corporation. The Telecommunications Act, as we've seen in this case and the prior case, requires that the plaintiff's discretion in refusing to toll the statute of limitations presents a lot of confusing and complicated issues. This case does not. This case presents two very simple and straightforward questions. First, when did the claim that plaintiffs asserted accrue? And secondly, did the district court abuse its discretion in refusing to toll the statute of limitations? It actually seems incredibly complicated to me, but to cut to at least one chase, if they had filed their Federal case at any of the points that you say they should have filed them, well, let's leave the last one aside, the 2007 date, okay, but any of the others for now, and then get to the 2007. There was a right proceeding in State court, and leaving aside the file-to-rate doctrine, I would think at least, and I think your brief acknowledges this, that you couldn't really, if there were liability, you couldn't, the Federal case would have to stop at that point and let the right proceeding go forward in the PSC. Is that right? That's correct. And that your position is that they should have filed the case anyway at that point, even though it would have to stop in the middle? That's correct. And where do you get that from? Rider v. Cooper, United States Supreme Court, Your Honor. That involved ICC rates and the timeliness of challenged ICC rates, and the court there held that you have to file a suit for damages for unreasonable charges within the limitations period, even if the issue of the level of charges, whether they're reasonable or not, must await a determination at the commission. Is there a difference, by the way, in this context between damages and refunds? No. I don't think so. At some points it appears that the district court or the parties are claiming that there's one thing going on with damages and another thing going on with refunds. Well, the one distinction that plaintiffs try to make is between what they call overcharges and refunds, and the cases that talk about overcharges are talking about charges that are inconsistent with the tariff. The tariff says charge a dollar. They charge $2. Very straightforward. That kind of claim can go to court. What's at issue here is a refund of a charge that is determined in the proceeding unreasonable for some reason. So in Oregon, as well as elsewhere, it has been held that the PUC has jurisdiction in that sort of case, both to determine the appropriate rate and to order a refund. So I think that's the distinction that's been talked about. The first question is simply when did plaintiffs claim accrue? And there are many points in time that the district court talked about, but I think that this Court really needs to focus on only one, 2001, when plaintiffs filed their claim for refunds at the PUC. Under this Court's precedent, the filing of a prior claim, including at an agency, establishes that the claim had accrued as a matter of law. And that, of course, makes sense. If the question is, is the party on inquiry notice that it has a claim, the fact that they actually filed a claim really answers that question without the need for any further discussion. Does the PUC and the courts have concurrent jurisdiction over these refunded cases, issues? Or are they sort of hedging their bets because no one knows which one has jurisdiction? Well, I think that they probably do. I think that they probably do have concurrent jurisdiction. Although the recent order by the FCC at least expresses that agency's strong opinion that the State commissions are the most appropriate place to bring these claims. But I think, as DeVell filed a case in the District of Washington in 2003, and in this DeVell is a plaintiff in this case, as they were in the DeVell case, and they were represented by the same lawyers. And that lawyer chose to file this case at the PUC in 2001 and then file the other case involving 11 other States in Federal court. So I think there is concurrent jurisdiction. We would have we did argue that the PUC at least had primary jurisdiction, but of course that assumes that there is concurrent jurisdiction. So I think the question of accrual is pretty open and shut, that it accrued in 2001 when they filed the claim. The next question then would be whether there was any basis for the argument that the court should equitably toll the running of the statute of limitations. Kagan. I mean, I gather your answer is, yes, maybe, but you still have to file the lawsuit. Yes. I think that's correct. Yes. You have to bring a claim timely. And in this case, I think this case is illustrative. Plaintiffs filed it at the PUC in 2001. In 2004, they moved for summary judgment on the issue of liability. And at that point, they told the PUC, determining damages needs to wait until the whole rate-setting process is completed, but you can at least decide the issue of liability. Did Quest rely on the refund order? And the same thing could have happened had they chosen to file this case in Federal court in a timely manner. With respect to the argument of equitable tolling, this Court's precedent suggests that's reviewed for an abuse of discretion, although the cases are somewhat inconsistent. But frankly, we don't think the standard of review makes much of a difference. There simply are no facts here that would support an argument for equitable tolling. As the Court knows, that's reserved for extraordinary cases. This Court has established as a rule that a party may not claim equitable tolling once they're represented by counsel. And that's the Johnson v. Henderson case and other cases. And there's no dispute here that plaintiffs were represented by counsel from at least the point in 2001 when they filed the PUC case. Again, same counsel that was representing the other parties in the DeVal case in this Court. Ginsburg. But what about these custom net rates? Were they even in the PUC case? They were not in the PUC case. Initially, the case was filed strictly about PAL services, public access line services. In 2009, the plaintiffs at the PUC sought to amend the complaint to add a claim for custom net. And the PUC denied that, finding that it was barred by the statute of limitations and it did not relate back because it arose out of a different set of circumstances, custom net rates not being covered by the waiver order. So that was raised for the first time, and the PUC, relying on the DeVal case, denied that amendment. So, again, bright-line rule, plaintiffs are represented by counsel, can't be heard to argue equitable tolling. In any event, there really are no facts that would certainly, you know. Well, but that's not – I mean, generally that's not true. I mean, there are lots of different kinds of equitable tolling, of which one is failing to know something because you don't have lawyers, but another one is having a pending lawsuit in another forum, which for some reason can't be completed. That's a whole different variety of tolling. And that seems to be flat wrong, your position. Well, there are – you make a fair point. I mean, the case does say that. Johnson versus Henderson. That's what the case was about. But if the case wasn't a – that was the tolling claim. The tolling claim was that I didn't do something right. And they say, well, once you have a lawyer, you have to do it right. But that's a different – they're all different tolling theories. And one of them, which is very common, and is, you know, I filed a case in State – Federal Court. It turned out the Federal Court didn't have jurisdiction. I should be able to go back. In California, for example, at that point, the limitations period is tolled and you go back to State court. Yeah. And there are – you're right, Your Honor. There are cases that say if you filed in a court that doesn't have jurisdiction, although not in a court that clearly didn't have jurisdiction, the court may toll it. I have not found a Ninth Circuit case to that effect, but there are other circuits. Okay. Maybe not in this context, but there are lots of them. And that is the argument that plaintiffs make, that the PUC did not have subject matter jurisdiction. Six plus actions, for example. If somebody is a member of a putative class and the class ultimately isn't certified, they still – they're not stuck with the limitations period. Yeah. Fair point. And that's the argument that plaintiffs make, that the PUC did not have jurisdiction. Or at least that's the argument they made before today. Today, they seem to concede that the PUC had jurisdiction. But all of those cases where a court has tolled the statute of limitations because the other court did not have jurisdiction were cases where it had been determined that that other court or agency did not have jurisdiction and the plaintiff was thrown out of court. They simply had no other remedy. Of course, in this case, it has never been determined that the PUC did not have jurisdiction. The plaintiff filed the case there. Quest did not move to dismiss. Quest did not challenge the jurisdiction. The PUC found sort of inexplicable the assertion that it did not have jurisdiction. But it went on and decided the case. That case is now on appeal to the Oregon Court of Appeals. So the this case simply does not fit within the line of cases that allow tolling where a prior court did not have, where a claim was timely filed in a court that was ultimately determined not to have jurisdiction. I'd briefly turn to our motion to dismiss the appeal. The same claims that were made before the district court were made before the PUC or certainly are claims that could have been made before the PUC. Kagan. I have a question about Dabble and the limitations period. There's this paragraph in Dabble which says, this analysis reflects a key difference between the damages claim concerning the Fraud Protection Services and the one based on the waiver order and goes on. I'm sure you know the paragraph. So the question is why isn't that the situation, which seems to suggest that, in fact, the cause of action doesn't accrue until the rate, until the later filed, the rates were deemed noncompliant by the agency? Well, what Dabble held is that the cause of action accrued at the latest when Quest filed rates that were compliant with, they didn't have to be determined to be compliant. So in 2003, in those States, just as in Oregon, Quest filed rates that were determined many years later to be compliant. But for the accrual point, filing those rates certainly would have alerted anybody to the fact that perhaps the rates that were charged before were not compliant. So certainly at the latest, the claims here accrued in 2003, as the Court stated in Dabble. And the Court found that, actually found that point important in Dabble, because it, in connection with referring the matter to the FCC under primary jurisdiction, faced the issue of whether the case should be stayed or dismissed. And the Court said, well, the plaintiff would suffer or could suffer a prejudice if the case were dismissed because their statute of limitations accrued at the latest when Quest filed its rates in 2003. Again, no requirement that they have been determined to be new services test compliant. And that's really one of the big problems with their argument that their claims did not accrue until 2007, when the PUC finally approved those rates. There was nothing about that decision that added to plaintiff's inquiry notice about whether its claims, whether it had been injured or at least believed it had been injured. They believed they had been injured as early as 2001 and believed that they had what they called powerful evidence that they had been injured, and they moved, they moved they brought their claim at that time. With respect to the motion to dismiss the appeal, when this case was filed in 2009, we asked the Court to abstain because there was another case pending. The Court did not reach that issue. But while this appeal has been pending, the PUC has now, it's more than, more than another case is pending. That case has been decided, and that case has preclusive effect over this case. Under Oregon law, agency decisions are entitled to preclusive effect. The ---- First of all, not with regard to the custom net claims, right? Well, those claims could have been asserted. They were not the ---- that would be more of a claim preclusion issue than an issue preclusion. But those claims certainly could have been asserted, and that's what the PUC said in 2009 when it denied the amendment, that they were untimely. So the fact that they failed to bring those timely still does not bar claim preclusion applying to the custom net issue or the custom net claim. The only argument that plaintiffs really made against claim preclusion, well, I guess they made two. The first one was that the PUC did not have jurisdiction. And Oregon law, again, which applies to the issue of collateral estoppel and res judicata, is quite clear that the jurisdiction cannot be collaterally attacked in a later case. That has to be attacked, raised, decided in the case, the initial case, the case that may have preclusive effect, and any appeal, direct appeal from that case. So that's not an argument that this Court really should even get into. In any event, there is no basis for that argument. Plaintiffs rely on Section 207 of the Act and a ---- this Court's decision in a case involving AT&T and the Coeur d'Alene tribe, that case simply held that a claim under the Act is within the exclusive jurisdiction of the FCC or the Federal Court, but it doesn't apply to the claim they made here, which is a claim to enforce an agency order. That claim is within the jurisdiction of the Public Utility Commission. The plaintiffs also argued that under some older PUC cases, the PUC did not have jurisdiction to award refunds. Again, that goes to the issue of overcharges for ---- for overcharges above the level set in the tariff as opposed to a refund on the basis that a tariff rate is not just unreasonable. Those cases hold that the PUC does have jurisdiction. And indeed, the FCC has confirmed the PUC's jurisdiction in the most recent order on the payphone issues. So with that, I will sit down unless the panel has any further questions.  Thank you. The issue with respect to the statute of limitations has to be addressed. And the declaratory ruling that was just handed down addresses that issue in this manner. It makes it very clear that the PUC is the exclusive place for rates to be set. It also makes it very clear that until those rates are set, there is a liability to pay to make those rates consistent under the 1997 deadline of April 15th, 1997. What happens, it was, is that you could not take the position that the FCC and the congressional policy said that you were not to charge rates that exceeded what was allowed by law and then never be accountable for it. It's kind of like a tax return. I thought what the ---- that the FCC's opinion was pretty amorphous and essentially said whether you get refunds or not beyond the 1-month date is basically up to the States, the State PUCs, under their State rules. That's correct. What they said, though, is you have to pursue all the administrative remedies. That's what we've been doing for 16 years. First, to set the rates, and then to get those rates compensated by refunds. But apparently the State doesn't have to give refunds, either. Whether they give refunds or not is up to the State. Ah, it's not up to the State to ignore Federal law. Why do you say that's right? You're very hard to listen to in terms of that. I'm, I'm, I'm, part of my problem is I'm having a hard time hearing you, and that's my ears, and I apologize for that. But the reality of it is, is that you have two proceedings. The first proceeding sets the rates, but it set the rates in error. It set those rates in error the first time in 2001. That was corrected in 2004, November 2004, in pursuit of the administrative remedies available to the plaintiffs as they intervened in that rate-setting proceeding at the PUC. They then went to court when the rate was final. That was the first final filed rate in October of 2001. That rate was then appealed. That appeal was successful. And the Oregon Court of Appeals said, you must follow all the Federal law. At that time, the Federal law was, was in flux with respect to the Wisconsin order in 2001. But by the time the court got to it in 2003 and 2004, then it was known. They had to file all the Federal law, and they hadn't. The PUC has set a rate that was not consistent with the 1996 Act. As a result of that, there was a, there, as Mr. Reichman calls it, it's a distinction between overcharge. He's correct. It's not technically an overcharge. It is technically a charge that is not allowed by law. You cannot charge more than an NST-compliant rate from April 15th of 1997, except for one narrow little opportunity. They were given 45 days to get those rates filed and lawful. Forty-five days. That's all they got. It didn't, it didn't change any of the liability under the, under the waiver order or, excuse me, under the Telecommunications Act. It didn't give anything other than just an extension, just like we get a tax extension by sending in and requesting an extension. It doesn't change our liability under the tax code. It doesn't change our liability to pay the taxes. And it certainly doesn't change our liability to maintain the, the documents backing it up. And that's what Quest had not done. So the problem here is that the jurisdictional issue is different in the rate-setting matter, because they're, they're trying to reach a final rate. In the refund case, we did not believe until the declaratory ruling that the, that the PUC had the jurisdiction to assert that independent refund. But now, because of the declaratory ruling, it's clear that what the FCC intended was for those refunds to be determined in the rate-setting case and then to offset so that as of April 15th, 1997, nobody was charging a non-lawful rate. All right. So what's the role of the Federal court at that point? Okay. At that point, once the rates are all set. And the refund determination is made. Okay. And the refund determination has to be made in the, in the context of the rate-setting. At that point, then the Federal court, we, we wouldn't have a case in Federal court, because those refunds would have made the clients whole if the rate, after the refund application, made them lawful back to April 15th of 1997. But if the agency, in your view, is erroneous with regard to the refund, why don't you do just what you did, which is go to State court? How do you get here? What are we supposed to do then? Okay. We're now at the court of appeals. We have appealed it. Okay. And that's part of it. What is the role of the Federal court under this regime as of the end of 2013? What are we supposed to do? If the only question of whether there is a refund is a question of State law for the State PUCs, what do we do with it? Why, why did we file the case? Because there's different claims. It's not all just refunds. Mr. Reichman has glossed over it and said that damages and refunds are the same, but that's not the case. There are other common-law claims, as well as. What are they? How are they different? Interference with a business relationship. All these, all these payphone operators basically could no longer afford to operate their payphones, and so they had to terminate their leasing arrangements with the people where the payphones were. And so they lost revenue because they were being charged an inflated rate, about 70 percent, over what was allowed from 1996 all the way through 2003. So basically, you're now telling us that all the refund claims are not here anymore and all we've got is some damages claims. No. What I'm basically saying is, is that now that we know what the filed rate was in, in 2009, that was the predicate to Federal claims. At the time that we filed this, it was not clear whether or not the PUC had the right to establish refunds as a standalone issue, just like in the Coeur d'Alene tribal case. Now we know, because of the declaratory ruling, that what the FCC intended was for all of that to be done in the context of setting the rates so that they were lawful as of April 15, 1997. And until that happens, then all Quest has done is kept the windfall, they've kept the money, and they have never accounted to anyone for money that Congress says they could not collect. But they collected it and have now used technicalities and confusions and delay to put this Court in a position where it says, I can't understand why we're still here, and the reason why we're still here is because this issue hasn't been resolved. I'm not asking you why we're still here. I'm asking you why we're here, not still. Okay. Why are we here? Okay. If the issue is for the determination of the PUC, leaving aside your separate damages claims, but in terms of the refunds, why doesn't that just go to the PUC and up through the State courts? Well, that's where it's going. But we had asked for declaratory relief before the declaratory ruling. You're telling us we should ignore all that for purposes of our decision because it's not here anymore. Well, no, what I'm saying is that the FCC has now issued the order that this Court asked the district court in Duval to request by reference to the FCC. They finally issued the order 16 years later, but, I mean, they finally didn't issue it, and it now makes it clear. I think the declaratory ruling resolves literally virtually all of these things. And from the standpoint of the motion to dismiss, it shows that the order is manifestly wrong. It can't possibly rewrite and have the declaratory ruling, which is the interpretive order of the FCC, the two were inconsistent, completely inconsistent. Anything else? Thank you very much. Thank you, counsel. The case is adjourned. It will be submitted. The Court will stand in recess for the day. Thank you.
judges: Goodwin, Reinhardt, Berzon